UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEO FINANCE, LLC,

               Plaintiff,                             Case Number 13-14299

v.                                            Honorable David M. Lawson

UNIVERSITY SQUARE 2751, LLC,

               Defendant,

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

The dispute in this case is over the ownership of a geothermal water supply system installed in two buildings on East Jefferson Avenue in Detroit, Michigan under a Geoexchange Water Supply Agreement. Neither the plaintiff nor the defendant are original parties to that agreement. Plaintiff GEO Finance, LLC acquired the interest of the system's installer and claims rights to the equipment and monthly maintenance charges under the agreement. Defendant University Square 2751, LLC purchased the East Jefferson properties following foreclosure proceedings. The plaintiff alleges in a three-count complaint (claiming breach of contract, conversion, and unjust enrichment) that it is entitled to collect monthly charges for the operation of the system and eventually recover the equipment, contending that the agreement is a lease. The defendant contends that the agreement actually is a financing arrangement and the system's equipment are building fixtures. It follows, the defendant argues, that because neither GEO Finance nor its predecessor in interest filed a financing statement, its interests were extinguished by the foreclosure and sheriff's sale, and the defendant acquired the equipment free and clear. And because University Square was not a party to the Geoexchange Water Supply Agreement, it owes nothing for monthly maintenance payments.

There are no serious disputes as to the basic facts.  The parties have filed cross motions for summary judgment.  The Court heard oral argument on March 10, 2015 and now concludes that the Geoexchange Water Supply Agreement is a true lease, the plaintiff maintains an interest in the equipment despite the lack of a financing statement, there is no binding contract for monthly payments under which the defendant is obliged, but the plaintiff is entitled to recover on its counts for conversion and unjust enrichment.  Therefore, the Court will grant in part the plaintiff's motion for summary judgment, deny the defendant's motion for summary judgment (except for the breach of contract claim), and schedule the matter for a trial on damages.

## I.

GEO Finance's predecessor in interest, Hardin Geotechnologies, Inc., until around 2010, was in the business of designing, constructing, and maintaining "geoexchange water supply systems" for various commercial and industrial clients in Michigan and other states.  The systems are engineered to provide a heat source or heat sink for heating and cooling a customer's buildings.  Rob Lundstrom, a former principal of Hardin, testified that these geothermal water supply systems "could have a [useful] life span in [the range of 50 years]."  Def.'s Resp. [dkt. #33], Ex. A, Rob Lundstrom dep. at 18.  In 2001, Hardin built the systems at issue in this case for its customer U-Square Associates, L.P., which then owned the properties at 2751 and 2761 East Jefferson Avenue in Detroit, Michigan.

### A.  The Geoexchange Water Supply Agreement

On October 29, 2001, U-Square and Hardin executed a "Geoexchange Water Supply Agreement" under which Hardin agreed to construct and maintain a system of its own proprietary design on U-Square's property at 2751 East Jefferson.  Under the terms of that agreement, Hardin

-2-

undertook "within 90 days of the date of this Agreement, [to] complete construction of an energy related geoexchange water supply system on Client land (the 'Supply System')." Plf.'s Supp. Br., Ex. A-1, Geoexchange Water Supply Agreement ¶ 1 (Pg ID 577). The parties entered into a materially identical agreement for the construction and maintenance of a similar system on U-Square's neighboring property at 2761 East Jefferson. Both agreements provide that they "shall be governed by the laws of the State of Michigan." Agreement ¶ 8(C).

The agreement required Hardin to "furnish, maintain and repair, at [Hardin]'s sole cost and expense, all design services, pumping equipment, water wells, main piping, metering and maintenance necessary to provide the Client with a sufficient quantity of geoexchange water [to meet certain flow rate and temperature specifications]" *Id.* ¶ 1. Hardin was obligated both to supply all the component parts of the system, and to perform any on-site work needed to install and maintain them, and the agreement provided that any "equipment installed by [Hardin] shall remain the sole Property of [Hardin] until the Client's exercise of its option to purchase the equipment under the provisions of paragraph 7." *Id.* ¶ 2.

In Paragraph 7, the agreement stated that U-Square would "have the option to purchase the Supply System at any time during the term of this Agreement," at a purchase price of "$296,075 during the first eight years from the date of this Agreement," and at any time thereafter for $281,000. *Id.* ¶ 7. U-Square could exercise the purchase option at any time by "giving 60 days prior written notice to [Hardin]," and the agreement provided that "[u]pon Client's exercise of the option to purchase the Supply System, and [Hardin]'s delivery of a warranty bill of sale covering the Supply System," the agreement would terminate. *Ibid.*

U-Square, for its part, was obligated under the agreement to "pay [Hardin] a one-time connection fee of $1,000 upon the initial billing of the system," and after the system went into operation to "pay [Hardin] sixty-one Cents ($.61) per thousand gallons of water . . . metered by the Supply System." *Id.* ¶ 4. The 61¢ price would be fixed for ten years from the date of the agreement, and after that period "the rate may be increased a maximum of 2% per annum not to exceed the CPI inflation index (commonly employed for lease adjustments in the Detroit area)." *Ibid.*

The agreement "start[ed] on the first day the geoexchange System [was] operational and continue[d] for ten years," and it offered U-Square the "option to extend the lease term for eight consecutive terms of five years." *Id.* ¶ 5. The agreement contained an evergreen provision, by which the renewal option was triggered automatically unless U-Square notified Hardin in writing that it did *not* intend to renew.

The agreement provided that either Hardin or U-Square could terminate it in the event of a "material breach" by the other party followed by a failure to cure for sixty days after written notice of the breach.

On September 30, 2010, after Hardin defaulted on a loan that it owed to Old National Bank, plaintiff GEO Finance put together a refinancing package under the terms of which it paid off the loan from Old National and acquired all of Hardin's assets. On June 1, 2011, under the buyout agreement, Hardin assigned its rights and obligations under the Geoexchange Water Supply Agreement to GEO Finance.

When GEO Finance succeeded to Hardin's rights under the agreement, it notified the management company employed by the then-owner of the East Jefferson properties that it should send monthly usage payments under the lease directly to GEO Finance. GEO Finance sent invoices

to the management company every month, and all were paid in due course, until the property was sold to the defendant.

After GEO Finance learned that University Square had acquired the property, it sent a similar letter and monthly invoices to University Square, which never made any payments. University Square also refused to allow GEO to access the property to read the meters on the geothermal system.

### B.  2751-2761 East Jefferson Avenue

On June 12, 2007, U-Square sold the properties to 2751 Jefferson Realty, LLC. On that same date, 2751 Jefferson Realty executed a mortgage on the properties in favor of JP Morgan Chase Bank, N.A. Presumably, Jefferson Realty defaulted on its obligations to the bank, because the bank later foreclosed on the mortgage, a sheriff's sale was held, and on April 1, 2011, the properties were conveyed by sheriff's deed to the bank's holding company affiliate, 2751-2761 Jefferson Avenue Holdings, LLC.

On September 27, 2012, Sidhant Dhir bought the properties from Jefferson Avenue Holdings. Dhir later assigned his interest in the properties to his company, defendant University Square. In the purchase agreement, Dhir agreed as purchaser of the properties to "assume all Contracts at Closing (such Contracts being herein referred to as the 'Assumed Contracts')." Purchase & Sale Agreement ¶ 3.7. The purchase agreement stated that "[a]s used herein, the term 'Contracts' shall mean all service, maintenance, supply, or other contracts relating to the operation of the Property, and all other such assignable contracts or agreements in effect as of the Effective Date." *Ibid.*

Mr. Dhir purchased the property with his own money, but relied on his father, Anil Kumar, for advice on the financial and business aspects of the purchase.  Mr. Kumar testified that, before the purchase of the Jefferson Avenue properties, he and Mr. Dhir both reviewed certain financial statements prepared by Farbman Group, Inc. — the management company employed by Jefferson Avenue Holdings to manage the properties — that were supplied as part of the package of due diligence documents for the property on the website Auction.com.  In particular, Kumar admitted that he saw the amount of $44,176 budgeted for the "contracted monthly geothermal loop at 2751-61 E. Jefferson with Hardin Geothermal," Kumar dep. at 30-31, 44, but he never asked anyone what the entry meant, because he assumed that he and his son would employ a different management company after the purchase.  Kumar knew that the building had a geothermal system as a result of his pre-purchase inspection, but he never asked anyone about it.

The financial documents disclosed as part of the property sale on Auction.com reflected amounts paid or owed to GEO Finance based on the geoexchange water supply agreement in numerous line items.  *First*, the documents showed specific payments over time to GEO Finance as a result of past monthly usage.  The "Monthly Financial Report for December 2011" listed items attributed to "R&M Other," (which Kumar understood to mean "repair and maintenance"), including an actual amount paid for the year of $31,042.90 against a budgeted amount of $42,000.  The report attributed the amount to "budgeted expense for Geo Thermo monthly circulation use at 2751/2761 E Jefferson."  The reconciliation report from December 2011 showed payments to GEO Finance, LLC on October 17, 2011 ($4,272.44) and November 15, 2011 ($1,931.87).

The related "Accounts Payable Expense Distribution" for November 2011 showed a "Water/Sewer" amount payable to GEO Finance, LLC for the period November 1, 2011 to

November 30, 2011 of $1,517.07, and a payment under "R&M Other" for "10/11 GEO THERMO USAGE" in the amount of $2,630.93. The "Monthly Ledger" report for the property likewise showed a line item under "R&M Other" in the amount of $2.630.93 for "10/11 GEO THERMO USAGE." Similar reports from July 2012 also showed payments to GEO Finance.

The "Balance Sheet" for the property showed an amount owing to GEO Finance, LLC as of July 16, 2012 of $3,848.93, which was attributed to "GEO THERMAL LEASE 6-1/7-16." Similarly, projections for future years showed annual amounts budgeted for usage payments under the agreement. The "Farbman Management Group 2012 Budget Presentation" for the properties listed an amount budgeted for 2012 of $44,176, categorized as "R&M Other" and described as a "[b]udgeted expense for the contracted monthly Geo Thermal loop at 2751-61 E. Jefferson with [Hardin]." The related "Schedule of Prospective Cash Flow" showed expenses under "R&M Other" of $44,176 (2012), $53,741 (2013), $55,354 (2014), $57,014 (2015), and $58,725 (2016).

## C. Procedural History

The plaintiff filed its complaint on October 10, 2013. The complaint states counts for conversion (count I), unjust enrichment (count II), and breach of contract (count III). On January 6, 2014, the defendant filed a third-party complaint against its title insurer, First American Title Insurance Company. The Court filed an opinion and order dismissing the third-party complaint on December 29, 2014, and an opinion denying the defendant's motion for reconsideration on January 22, 2015. Under the Court's scheduling order, discovery closed on October 31, 2014. Thereafter, the plaintiff filed its motion for summary judgment on November 14, 2014. With leave granted, the defendant filed its motion on December 19, 2014.

-7-

II.

The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required only when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The parties have not seriously contested the basic facts of the case. Where the material facts are mostly settled, and the question before the court is purely a legal one, the summary judgment procedure is well suited for resolution of the case. *See Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 435 (6th Cir. 2009).

A. Characterization of the Agreement

University Square argues that the geoexchange water supply "systems" are "fixtures," based on the fact that the wells and piping involved in the systems are integrated into the walls, floor, and ground underlying the buildings, and the water supply loops are connected to the heating and cooling (HVAC) systems of the buildings. Because the systems are fixtures, University Square

-8-

reasons that Article 9 of the Uniform Commercial Code governs the plaintiff's "security interest" in the systems. And because it is undisputed that neither the plaintiff nor its predecessor recorded a financing statement, the unperfected (unrecorded) interest is void against a later recorded interest. University Square insists that any interest in the geothermal equipment, therefore, was extinguished by the foreclosure proceeding initiated by JP Morgan Chase Bank, because of the bank's recorded interest and Michigan's statutory "race-notice" rule. Lastly, University Square argues that to the extent that the plaintiff claims that the bank consented to the enforcement of its leasehold interest after the foreclosure or disclaimed any interest in the system, that consent or disclaimer was void as a matter of law under Michigan's Statute of Frauds, Mich. Comp. Laws § 566.106, because the plaintiff has offered no evidence of any writing "signed" by the bank showing the consent or disclaimer, and the statute prohibits the "surrendering" of any "estate or interest in lands" absent a writing "subscribed by the party."

GEO Finance argues that (1) the original agreement was a "true lease" and therefore governed by UCC Article 2A, which does not require the lessor to make a fixture filing or otherwise perfect its leasehold interest; (2) Article 2A expressly provides that creditors of the lessee take subject to the lessor's interest in the event of any default; (3) the classification of the system is irrelevant because a leasehold interest may be held in fixtures as well as goods; and (4) even if unrecorded, a leasehold interest in fixtures is valid where the encumbrancer or owner with a purportedly superior interest consents to the assertion of the leasehold interest or disclaims any ownership in the fixtures, which the bank did in this case by honoring the lease agreement. GEO Finance contends that the defendant's extended discussions of Article 9, "race-notice" priority rules, and the law governing foreclosures all are irrelevant because the lease was not a "security interest"

-9-

and therefore was not extinguished by the foreclosure or sheriff's sale. Finally, GEO Finance argues that, even if the lease was a "security interest," the defendant did not take the property clear of that interest, because it had either actual or inquiry notice of GEO Finance's "lease" interest in the geothermal system before the purchase, and it therefore was not a purchaser in "good faith."

University Square responds that the agreement between GEO Finance and U-Square was not a "true lease," because (1) it was not terminable by the lessee; and (2) it was renewable for no additional consideration up to a cumulative term of 50 years.

### 1. "Lease" vs. "Security Interest"

At oral argument, the parties agreed that if the Geoexchange Water Supply Agreement is deemed a lease, then the plaintiff has rights in the system equipment that was installed in the building, regardless of whether it is determined to be a fixture, and irrespective of whether there was a perfected security agreement. On the other hand, if the agreement is a security agreement, then the plaintiff's interest was extinguished, unless the defendant had actual notice of the obligation and was not a bona fide purchaser for value. *See* Mich. Comp. Laws § 440.1201(2)(i).

When determining the meaning of the Geoexchange Water Supply Agreement, the Court must ascertain the intention of the parties from the words they used in their document. *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n.28, 517 N.W.2d 19, 29 n.28 (1994) (stating that the first objective in contract interpretation is to "honor the intent of the parties"); *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 61, 664 N.W.2d 776, 787 (2003) ( confirming that "[w]ell-settled principles of contract interpretation require one to first look to a contract's plain language."). If there is no ambiguity, "'the construction is a question of law for the court on a consideration of the entire instrument.'" *In re Landwehr's Estate*, 286 Mich. 698, 702, 282 N.W. 873, 874 (1938) (quoting

*Griffin Mfg. Co. v. Mitshkun*, 233 Mich. 640, 642, 207 N.W. 814, 814 (1926)).  A contract is unambiguous if it "fairly admits of but one interpretation."  *Allstate Ins. Co. v. Goldwater*, 163 Mich. App. 646, 648-49, 415 N.W.2d 2, 4 (1987).

The Uniform Commercial Code (enacted in Michigan as Chapter 440 of the Michigan Compiled Laws) draws a sharp distinction between, and imposes separate bodies of governing law upon, agreements construed as "leases" versus those that create a "security interest" in personal property or fixtures.  *See* Mich. Comp. Laws § 440.1201(2)(ii).  The term "security interest" is defined to mean "an interest in personal property or fixtures which secures payment or performance of an obligation," and the rights of the holder of such an interest are governed by UCC Article 9 (codified as Mich. Comp. Laws §§ 440.9101 *et seq.*).  *Ibid.*  The term "lease" is defined as "a transfer of the right to possession and use of goods for a term in return for consideration."  Mich. Comp. Laws § 440.2803(1)(j).  Leases generally are governed by UCC Article 2A.  The UCC provides that, "the right of a . . . lessor of goods under [Article 2A (Mich. Comp. Laws §§ 440.2801 *et seq.*)] to retain or acquire possession of the goods is not a 'security interest,' but a . . . lessor of goods may also acquire a 'security interest' by complying with Article 9."  *Ibid.*  "Whether a transaction in the form of a lease creates a security interest is determined under [Mich. Comp. Laws § 440.1203 (Michigan's enactment of UCC § 1-203)]."  Mich. Comp. Laws § 440.1201(2)(ii).

As the official commentary to the UCC explains, this distinction under section 1-203 is "important because the definition of lease determines not only the rights and remedies of the parties to the lease but also those of third parties."  UCC § 1-203 cmt. 2.  "If a transaction creates a lease and not a security interest, the lessee's interest in the goods is limited to its leasehold estate; the residual interest in the goods belongs to the lessor."  *Ibid.*  "This has significant implications to the

-11-

lessee's creditors," because "'the lessor, since he has not parted with title, is entitled to full protection against the lessee's creditors and trustee in bankruptcy.'" *Ibid.* (quoting 1 G. Gilmore, Security Interests in Personal Property § 3.6, at 76 (1965)).

In its recent decision in *In re Purdy*, 763 F.3d 513 (2014), the Sixth Circuit explained that under UCC § 1-203, a "lease involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term"; while "a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt." *Id.* at 518 (quotations and citations omitted). In *Purdy*, the court was dealing with Arizona's enactment of UCC Section 1-203, which is identical to Michigan Compiled Laws § 440.1203. 763 F.3d at 519 (citing Ariz. Rev. Stat. § 47-1203). The court held that the "fact-sensitive analysis" of the question whether a commercial agreement is a true lease or a security interest "proceeds in two steps." *Id.* at 519. However, "[a]t all points in this analysis, the party challenging the lease[] bears the burden of proving that [it is] something else." *Ibid.*

In the first step, courts apply a "Bright-Line Test." If the agreement appears to be a lease under that test, courts proceed to a second step, applying the "Economics-of-the-Transaction Test."

Under the Bright-Line Test, a nominal lease is in reality a security interest "if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee," and any of the following conditions are met:

(a)     The original term of the lease is equal to or greater than the remaining economic life of the goods.
(b)     The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods.

   (c)     The lessee has an option to renew the lease for the remaining economic life
           of the goods for no additional consideration or for nominal consideration
           upon compliance with the lease agreement.

   (d)     The lessee has the option to become the owner of the goods for no additional
           consideration or for nominal additional consideration upon compliance with
           the lease agreement.

Mich. Comp. Laws § 440.1203(2); *Purdy*, 763 F.3d at 519 (quoting Ariz. Rev. Stat. § 47-1203(B)).

If, after finding any of these conditions satisfied, the Court concludes that "the lease runs longer than

the economic life of the goods, then the lease is a *per se* security agreement." *Purdy*, 763 F.3d at

519. Section 1-203 says that "[a]dditional consideration is nominal if it is less than the lessee's

reasonably predictable cost of performing under the lease agreement if the option is not exercised."

Mich. Comp. Laws § 440.1203(4). "The 'remaining economic life of the goods' and 'reasonably

predictable' . . . cost of performing under the lease agreement must be determined with reference

to the facts and circumstances at the time the transaction is entered into." Mich. Comp. Laws §

440.1203(5).

        If the transaction appears to be a true lease under the Bright-Line Test (i.e., the court finds

that the "goods retain meaningful value after the lease expires"), then the court applies the

Economics-of-the-Transaction Test. *Purdy*, 763 F.3d at 519. Under that test, the court examines

"the specific facts of the case to determine whether the economics of the transaction suggest that the

arrangement is a lease or a security interest." *Ibid.* (quotation marks omitted). The Sixth Circuit

observed that "[t]he precise contours of the economics-of-the-transaction test are rather unclear, but

courts have largely focused upon two particular factors: (1) whether the lease contains a purchase

option price that is nominal; and (2) whether the lessee develops equity in the property, such that

the only economically reasonable option for the lessee is to purchase the goods." *Id.* at 520

-13-

(quotations omitted). "The ultimate question . . . however, is whether [the lessor] kept a meaningful reversionary interest in [the goods]." *Purdy*, 763 F.3d at 519.

Section 1-203 further provides that "[a] transaction in the form of a lease does not create a security interest merely because" any of the following conditions are met:

> (a)    The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into.
> . . .
> (c)    The lessee agrees to pay, with respect to the goods . . . service or maintenance costs.
> (d)    The lessee has an option to renew the lease or to become the owner of the goods.
> (e)    The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed.
> (f)    The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

Mich. Comp. Laws § 440.1203(3).

The plain language of the agreement shows that it comprises a "lease" for the "equipment" supplied and installed by Hardin Geotechnologies as part of the geothermal exchange system. The Geoexchange Water Supply Agreement "transfer[red] the right to possession and use of goods for a term in return for consideration." Mich. Comp. Laws § 440.2803(1)(j). Hardin agreed to transfer to U-Square the right to possession and use of all "equipment" that Hardin was obligated to supply in the course of constructing and operating the system, for a term of ten years from the date the system was first put into operation, in return for an initial payment of $1,000 upon first activation and monthly payments for metered usage at the rate of 61¢ per thousand gallons of water supplied by the system. Because the transaction facially satisfies the statutory definition of a "lease," the

-14-

defendant bears the burden of showing that it is something else.  *Purdy*, 763 F.3d at 519.  However, the defendant has failed to advance sufficient evidence on which a jury could find that the agreement was not a lease.

The defendant argues that the Geoexchange Water Supply Agreement fails the Bright Line Test for a disguised security interest because (1) it is not terminable by the lessee; and (2) the lessee had an option to renew it to a cumulative term of 50 years, which equals or exceeds the economic life of the system.  That reading of the agreement is contrary to its plain language.  The agreement provided that its original term would "start on the first day the geoexchange system is operational and continue for ten years," and it offered U-Square the "option to extend the lease term for eight consecutive terms of five years."  Agreement ¶ 5.  The defendant has offered no evidence that the system as a whole or any part of it reasonably could be expected to have a useful life of ten years or less.  And the lessee could terminate the agreement in any of several ways, the first and most obvious of which is that the lessee could give written notice of its intent to terminate sixty days before the end of the original ten-year term.  The lessee also could terminate the lease at any time, upon sixty days notice, by exercising the purchase option under Paragraph 7.  Under that term the lessee could buy the system outright for $296,075 during the first eight years, or $281,000 at any later date.  Finally, the lessee could terminate the lease upon any material breach by the lessor (e.g., failure to meet specified flow rate and temperature parameters or adequately to maintain the equipment), with a failure to cure within sixty days after written notice.  Because the agreement was terminable by the lessee and did not demonstrably run for a minimum term "longer than the economic life of the goods," it is not "a *per se* security agreement."  *Purdy*, 763 F.3d at 519.

-15-

Under the Economics-of-the-Transaction Test, the outcome is the same.  The UCC explicitly provides that the mere fact that the lessee was obligated to pay maintenance costs or that it had an option to renew the agreement are not sufficient to show that the agreement was not a lease.  Mich. Comp. Laws § 440.1203(3).  The Sixth Circuit has instructed that the most weighty factors under this test are (1) whether the lease contains a purchase option price that is nominal; and (2) whether the lessee develops equity in the property, such that the only economically reasonable option for the lessee is to purchase the goods.  *Purdy*, 763 F.3d at 520.  Neither of those factors weighs in favor of the defendant's position here.

The original purchase price of $296,075 and the "discounted" price of $281,000 are not "nominal" as that term is defined under the UCC, because neither amount demonstrably exceeded a reasonable estimation of the lessee's cost of performing under the lease, based on any evidence in the record.  *See* Mich. Comp. Laws § 440.1203(4).  The "reasonably predictable" cost of performing under the lease agreement is difficult to ascertain by "reference to the facts and circumstances at the time the transaction [was] entered into," Mich. Comp. Laws § 440.1203(5), because the record is silent as to what rate of usage the parties contemplated at the outset of the agreement in 2001, and the agreement does not specify any minimum monthly usage or payment term.  If the lessee opted not to use the system at all, it would owe nothing beyond the initial $1,000 connection fee.  Nevertheless, the available evidence suggests that the purchase option price was substantially higher than any reasonably predictable cost of performance under the agreement.  For the five years 2012 through 2016, Farbman Group budgeted a total of $269,010, which is less than even the discounted price of $281,000 under the agreement.  There is no evidence that the lessee would have been faced with any substantially higher cost of performance than that projected by

-16-

Farbman, when deciding whether to renew the agreement for a five-year term or exercise the purchase option.

Moreover, even as to the reasonably predictable cost of performance for the original ten-year term, it is not apparent that the lessee necessarily would have had no other economically reasonable option than to purchase the system. There is no evidence in the record to suggest how much of the 61¢-per-thousand-gallons usage fee was allocated to maintenance and repair costs that Hardin was obligated to cover under the agreement. Even at the outset of the agreement, if the lessee had exercised the purchase option, it still would have needed to pay the costs of maintaining, repairing, and replacing the system and its components; to engage another maintenance provider in Hardin's place; or to continue paying Hardin, at some lower negotiated rate, for maintenance services alone. The fact that U-Square and its successors from 2001 to 2012 refrained from exercising the purchase option suggests that, when taking fully into account all economic consequences of exercising the option, none of them found it economically reasonable to do so. Instead, U-Square and later owners evidently found it more reasonable to continue under the original agreement, presumably because the total cost of buying the system and paying for all reasonably expected maintenance and repairs exceeded the cost of simply continuing the lease arrangement.

Finally, there is no evidence to suggest that the lessee developed any meaningful amount of "equity" in the system, since the "discounted" purchase option price of $281,000 available after eight years is fully 95% of the "original" option price of $296,075, and the agreement did not provide for any further reductions throughout the remaining term or any renewal terms.

The plaintiff has established as a matter of law that the agreement was a "true lease," because it is plain from both the express terms of the agreement and its reasonably ascertainable economic

-17-

consequences that Hardin (and later the plaintiff) "kept a meaningful reversionary interest in" the "equipment" installed on the properties as part of the geoexchange water supply system. *Purdy*, 763 F.3d at 519. The agreement provided that the lessor retained its full ownership interest in the equipment, and therefore could have reclaimed possession of it upon termination of the agreement, either at the end of the original term, at the end of any succeeding five-year term, or, if the lessee failed to pay any amounts due, upon exercise of its rights as a result of the lessee's default, Mich. Comp. Laws § 440.2973(1); *see also* § 440.2975 ("After a default by the lessee . . . the lessor has the right to take possession of the goods."). The defendant has not submitted sufficient evidence from which a jury reasonably could conclude that GEO Finance had no expectation of recovering its equipment "with some expected residual interest of value remaining at the end of the lease term." *Purdy*, 763 F.3d 518.

### 2.  True lease and fixtures

Article 2A of the UCC governing leases has been codified by the State of Michigan as Michigan Compiled Laws §§ 440.2801 *et seq.* Article 2A "applies to any transaction, regardless of form, that creates a lease." Mich. Comp. Laws § 440.2802. Generally "a lease contract is effective and enforceable according to its terms between the parties, against purchasers of the goods and against creditors of the parties," Mich. Comp. Laws § 440.2901, and "[t]he effectiveness or enforceability of the lease contract is not dependent upon the lease contract or any financing statement or the like being filed or recorded," *id.* cmt. 2. Except as to a party that obtains a lien on leased property as a result of providing services relating to that property, "a creditor of a lessee takes subject to the lease contract." Mich. Comp. Laws § 440.2907.

Under Article 2A, a lessor may hold a valid lease even in "goods" that have become or are deemed to be "fixtures" under applicable rules of law governing interests in real property.  Mich. Comp. Laws § 440.2909(1)(a) ("'Goods' are 'fixtures' when they become so related to particular real estate that an interest in them arises under real estate law."); Mich. Comp. Laws § 440.2909(2) ("Under this article a lease may be of goods that are fixtures or may continue in goods that become fixtures, but no lease exists under this article of ordinary building materials incorporated into an improvement on land.").  Moreover, the lessor's interest in fixtures "whether or not perfected, has priority over the conflicting interest of an encumbrancer or owner of the real estate if . . . [t]he encumbrancer or owner has consented in writing to the lease or has disclaimed an interest in the goods as fixtures."  Mich. Comp. Laws § 440.2909(5).

When JP Morgan Chase Bank took possession of the property after its foreclosure, it both respected and affirmed the plaintiff's valid rights by making payments required under the agreement for continued use of the leased geothermal system.  And when the defendant subsequently bought the property, it did so subject to the plaintiff's still valid and outstanding leasehold interest in the "equipment" included with the geothermal system.

University Square contends that the "lease," if it is one, embraces the entire "system" and not only the subset of items comprising the "equipment" that GEO Finance says were the sole objects contemplated in the "lease" provisions.  The defendant argues that this distinction is dispositive of the plaintiff's claim for conversion, because the "system" constitutes a "fixture" that has become affixed to the property, and the plaintiff's unrecorded "security interest" in that fixture was extinguished by the foreclosure.  However, under the circumstances, the question whether the "system" as a whole or the "equipment" included in it are "fixtures" is immaterial, because under

-19-

Article 2A the plaintiff's leasehold interest in the items is valid regardless of how the items are classified.  Mich. Comp. Laws § 440.2909(2).

Moreover, the plaintiff's leasehold interest is enforceable even though the parties agree that it never was recorded either as a "fixture filing" or in any other form.  Mich. Comp. Laws § 440.2909(5).  In 2010, after JP Morgan Chase Bank foreclosed on the properties and conveyed its interest to its holding company, Jefferson Avenue Holdings, LLC, the holding company engaged the Farbman Group to manage the property.  When GEO Finance learned of the change of ownership, it notified Farbman in writing of its rights under the Geoexchange Water Supply Agreement and directed Farbman to remit future payments for monthly metered usage to GEO Finance directly.  It is undisputed that Farbman did so.  Farbman not only honored the terms of the agreement through the end of its original term in 2011, but evidently continued making payments until the property was sold in 2012, and had budgeted amounts for future payments through at least 2016, indicating that it intended to abide by the term of the agreement providing for renewal on a five year term.

During the due diligence process leading up to the defendant's purchase of the properties, Jefferson Avenue Holdings disclosed numerous documents produced by Farbman that showed payments to GEO Finance by Farbman, paid and budgeted amounts of monthly and annual usage, and notes attributing the payments to "repair and maintenance" expense, "GEO THERMO USAGE," and "GEO THERMAL LEASE."  Whatever other significance those documents may have, they plainly constitute written evidence of the bank's (or its successor's or agent's) consent to GEO Finance's asserted ownership interest and disclaimer of any superior interest in the system or its components.  As the plaintiff correctly points out, there would be no reason for the bank to approve

-20-

the payment of more than $200,000 over the course of five years to "lease" the system from GEO

Finance, if it believed that it owned the system outright as a result of the foreclosure.

### B.  Conversion claim

In Michigan, conversion has both a common-law and statutory basis.  Common law

conversion "consists of any distinct act of domain exerted over another's personal property in denial

of or inconsistent with the rights therein." *Dep't of Agric. v. Appletree Marketing, L.L.C.*, 485 Mich.

1, 13-14, 779 N.W.2d 237, 244 (2010) (citation omitted).  There are two forms of statutory

conversion:

    (a)    Another person's stealing or embezzling property or converting property to the other person's own use.

    (b)    Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Mich. Comp. Laws § 600.2919a.

GEO Finance is entitled to judgment as a matter of law as to the validity of its leasehold

interest, and the undisputed facts establish that the defendant has appropriated, used, and refused to

surrender upon demand GEO Finance's property in the "equipment" installed as part of the

geothermal water supply system.  GEO Finance contends that it "asserts an ownership interest in

only the Geothermal Equipment (i.e. the pumping and metering equipment), not the wells or pipes

in the walls." Plf.'s Reply [dkt. #41] at 1.  Hardin's former principal, Rob Lundstrom, testified that,

although the piping and wells could not be removed, the "pumping equipment with the [system]

could be removed," and that under the agreement "GEO Finance could remove the right to use the

system." Lundstrom dep. at 26-27.  The defendant has not rebutted his testimony on either point.

-21-

An action to recover the equipment is allowed under the UCC. Mich. Comp. Laws § 440.2981(1) ("If a third party so deals with goods that have been identified to a lease contract as to cause actionable injury to a party to the lease contract . . . the lessor has a right of action against the third party.").

Nevertheless, the agreement does not identify the specific items embraced by the term "equipment," and the plaintiff made no presentation on this point in its briefing. The plaintiff is entitled to judgment as a matter of law as to the defendant's liability on count I of the complaint, but it has not identified the specific property that the parties to the original agreement meant to include in the category of "equipment." The plaintiff must offer evidence on that question at the trial on damages.

### C. Unjust enrichment claim

Under Michigan law, to plead a claim of unjust enrichment, a plaintiff must establish that the defendant has received and retained a benefit from the plaintiff and inequity has resulted. *Fodale v. Waste Mgmt. of Michigan, Inc.*, 271 Mich. App. 11, 36, 718 N.W.2d 827, 841 (2006). Michigan courts will then imply a contract to prevent unjust enrichment. *Ibid.* However, courts will not imply a contract where there is an express contract governing the same subject matter. *Ibid*.

For the reasons discussed above, the plaintiff is entitled to judgment as a matter of law on its claim that the defendant was unjustly enriched by the wrongful appropriation and use of the "equipment" included in the geoexchange water supply system. The defendant's refusal to pay the required monthly metered usage fees under the agreement did not breach any express contract between the parties. But it would be inequitable to allow the defendant to retain the benefit of its wrongful appropriation and use of the system, particularly where (1) the undisputed facts show that,

-22-

as a result of the due diligence document disclosures that it received before its purchase of the property, the defendant had actual or inquiry notice of the plaintiff's leasehold interest in the system and of the arrangement that the bank and Farbman Group had undertaken to honor with the plaintiff; and (2) the defendant nevertheless has refused to honor any part of that agreement, despite repeated demands from the plaintiff.

The plaintiff is entitled to judgment as a matter of law on this count as to liability only. It has not put into the record any evidence as to the extent to which it has been deprived of, for example, payments for metered usage since the defendants took ownership of the property. The plaintiff perhaps has been impeded in making such a showing by the defendant's refusal to allow the plaintiff access to the property to read the system's meter. Some further showing at the trial on damages will be required to establish the extent of damages.

### E. Breach of contract claim

To state a claim for breach of contract under Michigan law, a plaintiff first must establish the elements of a valid contract. *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453, N.W.2d 304, 307 (1990). The elements of a valid contract in Michigan are (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Thomas v. Leja*, 187 Mich. App. 418, 468 N.W.2d 58, 60 (1990). Once a valid contract has been established, the plaintiff then must prove (1) the terms of the contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff resulting from the breach. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

The defendant is entitled to judgment as a matter of law on the claim for breach of contract because the plaintiff has failed to present any evidence that a contract existed between the parties.

-23-

The existence of the original agreement is undisputed, but the parties to that agreement were Hardin Technologies — GEO Finance's predecessor in interest — and non-party U-Square Associates, L.P. The plaintiff has offered no evidence to suggest that the bank expressly assumed the lease, or executed any separate, equivalent agreement with GEO Finance when the property was conveyed to it by sheriff's deed in 2010. The conduct of the bank and its agent Farbman Group certainly could support a finding that a contract implied-in-fact existed between GEO Finance and either the bank's holding company or Farbman Group, as a result of the demand for payment by GEO followed by the management company's subsequent recording and payment of monthly remittances for metered usage under the terms of the agreement. But even if such an implied agreement existed between GEO Finance and prior owners of the property, it is undisputed that, after the most recent change of ownership in 2012, the defendant never affirmed any such agreement by words or acts, and in fact it has refused to abide by the terms of the agreement. Because no contract existed between the parties, either express or implied, the plaintiff's claim for breach must be dismissed.

III.

Because the Geoexchange Water Supply Agreement is a true lease, the plaintiff is entitled to exercise its right to possess and recover the equipment that is subject to that agreement. Proof is required to establish the specific items of equipment wrongfully retained by the defendant. Likewise, proof is needed to determine the amount of damages for unjust enrichment. The plaintiff has no valid claim against the defendant for breach of contract.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment [dkt. #28] is **GRANTED IN PART AND DENIED IN PART**.

-24-

It is further **ORDERED** that the defendant's motion for summary judgment [dkt. #40] is

**GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that count III of the complaint alleging breach of contract is

**DISMISSED WITH PREJUDICE**.  The defendant's motion is **DENIED** in all other respects.

It is further **ORDERED** that the plaintiff is entitled to a judgment of liability on counts I and

II of the complaint.

It is further **ORDERED** that counsel for the parties must appear before the Court on **April**

**14, 2015 at 2:00 o'clock p.m.** for a conference to schedule the trial on damages.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   April 13, 2015

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on April 13, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI

---